UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | | |
|---|---|---|
| MICHAEL LAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Case No. 15-cv-83-JMH |
| v. | ) | |
| | ) | |
| SOUTHERN STATES COOPERATIVE, | ) | |
| INC. | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*

This matter is before the Court upon Defendant Southern States Cooperative, Inc.'s ("Southern States"), Motion for Summary Judgment [DE 64]. In his Complaint, Land avers that he was discharged from the Assistant Manager position at Defendant's Richmond, Kentucky, retail location on March 21, 2014, as a result of discrimination based on disability in violation of the Americans with Disabilities Act ("ADA") and the Kentucky Civil Rights Act ("KCRA"); discrimination based on age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA") and the KCRA; in retaliation for being a member of a protected class with respect to disability and age, as well as in retaliation for his use of FMLA leave and his requests for reasonable accommodation under the ADA, ADEA, and KCRA; and in breach of an employment contract. Defendant argues that all of his claims must fail. Plaintiff objects in his Response [DE

67], and Defendant has filed a Reply in further support of its Motion [DE 69]. For the reasons which follow, Defendant's Motion will be granted.

**I.**

Land spent close to thirty years running his own plant nursery business. Eventually, he applied and was hired as an Assistant Manager for Southern States' retail store in Richmond, Kentucky on April 17, 2011. The store sells goods and services ranging from animal feed and health, crops, farm supplies, and propane. At the time of his employment application, Land represented that he could lift a fifty-pound bag of feed. As assistant manager, Land's duties included giving warehouse personnel directions and orders, filling in at the store counter or in the warehouse when clerks or warehouse personnel were gone or sick, and tracking leased propane equipment by documenting lease agreements for leased equipment. He was also responsible for directing recordkeeping and inventory control, being present on the store floor, following corporate standards, filling in for other employees as needed, and performing duties as assigned. Land's position included desk work, and Land worked from time to time in the assistant store manager's office, which was located behind another office and from which one cannot see what is going on out on the floor in the store. It was also

possible to complete some of that desk or computer work on the floor at another computer, sitting on a ladder if needed.

He had no employment contract with Southern States and received "Work Rules" providing that "[e]mployment is at-will and shall continue only as long as the employee and the company both want it to continue" and an Employee Handbook which stated that employment with Southern States was "at will" absent a written employment contract signed by the CEO of Southern States. He (but not the Southern States' CEO) also signed an Information and Non-Solicitation Agreement as part of his hiring packet which makes no suggestion that it was intended to abrogate Land's at-will employment status nor purported be an employment contract. When he was hired, he was provided a copy of Defendant's anti-harassment and anti-discrimination policy, which set out the process for addressing complaints of unlawful harassment and discrimination. Land's employment application to Southern States represented that he understood that his employment with Southern States would be at-will.

During Land's employment, the Richmond store had six to nine full-time employees, including warehouse personnel, the Assistant Manager (Land), and the store Manager (Richard Winn). The store also had one to two part-time employees and occasional temporary seasonal help. Land describes the store as short on staff, which he believed to be the result of budgetary

shortfalls and lack of funds. Winn was Land's direct supervisor. On May 8, 2012, and April 24, 2013, Winn gave Land generally good written reviews, reflecting that he "achieved expected performance," but testified that Land was "not a real good people person . . . kind of withdrawn, kind of a little abrupt, can be a little bit rude to people," gave vague directions and orders, and "would not discipline people." Donna Garcia, a manager in Southern States' human resources department observed that Land's appraisals from Winn were all good and there were no writeups in his personnel file.

During Land's employment, two District Managers were responsible for the Richmond store: Mike Hash (from Land's hire until June 30, 2012, and from July 1, 2013, through the termination of Land's employment) and Jim Briedwell (from June 1, 2012, through June 30, 2013). During Hash's absence in the summer of 2013, Briedwell provided the services of district manager for the Richmond store until Hash's return in August 2013. As a general matter, the district manager visited the Richmond store once every two weeks, sometimes for about four hours at a time. The assistant store manager would receive instructions and directions from both the district manager and the store manager. Land was not impressed with his managers, describing Hash as a "micromanager" and Briedwell as a "bully." He felt that neither Hash, Briedwell, nor Winn did anything

particularly well during his time with Defendant.   Terry Sweat served as regional manager responsible for the Richmond store during Land's employment.

Sweat observed that the Richmond store showroom, storefront, and outside lot area were maintained in a way that was below average for company standards during most of his store visits from April 2011 to July 2012.  Briedwell was aware of Sweat's concerns when he became district manager, including concerns about Land's job performance.  Briedwell was not happy with the store's compliance with company standards either, and he understood that it was Land's responsibility to make sure that the inside and outside of the store were up to the corporate standards.  Shortly after he became district manager in June 2012, Briedwell told Land that he needed to step up and do more of what he had been hired to do as Assistant manager or "they would hire someone younger and pay them - - and could pay them less."  In early to mid-fall of 2012, Briedwell told Land that Land was in charge of making sure that the inside of the store was up to Southern States' standards, that corporate floor, shelving, and stocking plans for the store were set, and that the outside of the store was generally clean.  He also advised that Land would work on setting up a garden center at the store.  Land felt the garden center was a bad business

decision and disagreed with various decisions involving in the garden center by upper management.

Briedwell repeatedly told Land that he was unhappy with his performance and that Land needed to keep up with the corporate floor, shelving, and stocking plans and spend less time in the office. Sweat continued to observe that the store was below the standards set for its condition. Briedwell also told Land that he had heard negative comments from store employees about Land. Briedwell concluded that Land did not believe him because, when Briedwell would not tell Land which employees had complained, Land told him that "you can't make a comment like that, unless you can back it up." Land responded to a written account of Briedwell's critiques by disputing the criticisms or placing blame on Winn or another store employee.

Land had a knee replacement surgery on June 6, 2013.[1] Before his knee surgery, Land requested leave through August 7, 2013, and his request was approved. Land developed cellulitis following the surgery, which necessitated extended leave from work. Land brought the papers concerning his leave request to work, and Winn "threw the papers back at" Land and told him to contact human resources. Land sent the papers to human resources and was approved to take additional time off after his surgery. At some point during his leave, Land came in for part

---

[1] Land also had surgery for carpal tunnel issues in July of 2012.

of a day to complete inventory, but he did not record any time for it. After some time had passed, Land's physician, Dr. Jeffrey Selby, authorized Land to return to work on July 2, 2013, for 4 hours a day and without lifting or standing for more than an hour at a time. During the period of this restriction, Land recorded four hours of work a day, even though he stayed at the store for longer periods of time because he felt that his help was needed for customers. Land verbally expressed his concerns about this situation to his immediate supervisor, Winn, but was reluctant to express too much concern because Land thought that Winn had a bad attitude about employees being off from work. Land based this belief on Winn's response when he brought his paperwork for additional time off to the store and because of an instance in which the two had discussed another employee's workers compensation benefits for an injury received at home with which Winn disagreed. Land described how Winn had "looked at [Land] and turned red in the face" when Land indicated that he felt it was a corporate decision.

More time passed, and Dr. Selby loosened Land's work restrictions on July 24, 2013, permitting him to work six-hour days for two weeks and then eight-hour days, with lifting limited to no more than 25 pounds and standing limited to two hours at a time. Land occasionally ignored those restrictions. He never told Winn that he was doing work in excess of the

restrictions, but Winn never intervened when he saw Winn lifting a bag or undertaking other activities. Sometimes Land would stand at the counter, hold up his leg and shake it, before sitting down on a bag of dog food and saying, "man, my knee is killing me today, and shew, I've got to sit down a minute." Winn responded, "well can you handle it? I'm gone for the day." Land did not otherwise tell Winn that he needed help or a break. He felt that Winn's body language discouraged him to discuss knee or back pain because if he made comments, Winn "would drop his head and look over his glasses" in a way that Land took to mean "don't you dare go there."

Winn recalled Land's request for accommodations consistent with his work restrictions and that Land never said "no," so he assumed that Land was in compliance with the restrictions. Winn did not recall Land requesting any accommodations other than those set forth in the work restrictions and expected Land to speak up if Land felt that he was being asked to violate those restrictions. Briedwell was unaware of any requests for accommodations and knew nothing of Land's knee or low back pain. Hash never provided negative feedback to Land for needing time off or for being on restrictions, and Land never discussed his restrictions following knee surgery with Hash. Sweat was aware of Land's leave and requested information about the application of paid time off and short term disability with respect to

Land's leave for knee surgery to be sure that it was handled correctly as he normally did for management-level employees.

When Hash returned as district manager in the first week of August 2013, Hash requested copies of Land's appraisals and write-ups to learn more about Land's job performance so that he would be prepared to work with Land and to improve Land's performance. Land's 2013 performance appraisal observed that Land would benefit from "spending more time at the counter and walking the sales floor" and that the housekeeping of the store needed to improve. Hash requested that he be advised when Land's work restrictions were lifted so that he would not ask Land to do anything contrary to those restrictions. Hash engaged in multiple conversations with Land about his poor performance but termination of Land's employment was not under consideration when, on August 30, 2013, the men met to discuss Hash's performance expectations for Land, including that Land would spend six to eight hours out of his office during each workday. Land did not communicate any concerns that this requirement might be contrary to his standing restriction.[2] Hash followed up on the issues that he identified in an August 30, 2013, email to Land during the remainder of his 2013 store

---

[2] Dr. Selby testified that such a requirement would not necessarily be contrary to the standing restriction and that, while he establishes the restrictions, it is up to the employer and the employee to figure out how to implement them.

visits.  Land found Hash's instructions confusing with respect to dead inventory and plan-o-grams, felt Hash was asking him to do additional work while other employees were slacking off, and disagreed with the priorities Hash assigned to different areas of the store.

In August and September 2013, Land told Winn that his knee and his back were giving him problems and that he felt it was from standing on the concrete for long periods of time and that he needed to take breaks but that Hash had said that he needed to be on the floor for six hours a day.  Winn explained that he would not contradict Hash and did not convey this information to Hash.  Land communicated with Hash, but only to express concerns about whether he had enough time to complete inventory and computer work related to propane not to express concerns about his physical condition.  In September or October of 2013, Land told Winn that he was experiencing back and lower extremity pain due to an issue with his sciatic nerve and was going to have to get relief from standing and sitting by going into the office to do computer work, attending doctor visits, and using non-surgical interventions to address low back pain.  He told Winn that "there was probably a 90 percent probability" that he would have back surgery in summer or fall of 2014.  Winn said nothing in response, but Land felt that Winn's look said "you're kidding me."  After that conversation, Winn would inquire of Land, "can

you handle it from here?" but Land felt that Winn was insincere and expected Winn to ask him if he needed to go home or take a break.

Meanwhile, Dr. Selby released Land to return to work with no active restrictions on October 23, 2013. Land told his treating physician for lower back pain, Dr. R. Carter Cassidy, as late as February 13, 2014, that he wanted to use physical therapy to treat his low back at that time and never followed up to seek a more aggressive treatment. There is no record of work restrictions imposed by his physician. There is no evidence that Hash, Briedwell, Sweat, or Garcia, had any information about Land's possible back surgery or requests for accommodations concerning his back. As of December 2, 2013, Land was able to lift fifty-pound sacks of feed at work and during his work on his farm.

Throughout the fall of 2013, Sweat believed that the floor and outside areas of the Richmond store were not up to par. During a December 2013employee meeting with nine to eleven other employees present, Hash made a reference to the movie *War Horse* in which a group of horses was working together to pull an object up a hill, and one struggling horse was shot and replaced with a different horse. In making the analogy, Hash made a comment to the effect of "I don't mean to imply that we will shoot you, but we'll make it to the top of the hill with or

without you." Another attendee was about Land's age, but the other attendees were younger. While Hash was making the alleged analogy, Hash did not expressly mention Land's name, but Land felt that Hash made eye contact with him. Land had seen the movie and, based on his recollection of the movie, he took the comment as a threat because the horse to which Hash referred was older.

On January 31, 2014, Hash gave Land a forty-five day Performance Improvement Plan ("PIP"). In reviewing the PIP before it was provided to Land, Donna Garcia expressed concern about the timeframe but was satisfied when Hash stated that he wanted to see improvement during the time frame of the PIP, not completion of all items. A PIP was intended to improve an employee's performance, not lay the groundwork for termination. Land's PIP was based on the assistant manager job description and Hash's interpretation of that description, and Land understood that Hash wanted to see improvement over the forty-five day period. He did not, however, feel that the assessment of his performance was correct and refused to sign the PIP until February 10, 2014. Land contacted Garcia about his PIP in mid-February but declined to share his concerns about it despite her invitation to do so. Briedwell was not involved in the PIP. Winn was not involved in developing the PIP and knew nothing of

it until Hash arrived at the store for a visit on January 31, 2014.  Winn felt that Land could meet the PIP.

Hash visited again on February 7, 2014, giving Land instructions on the store and an opportunity to ask questions. Land asked no questions about the PIP or his job duties.  On February 10, 2014, Winn and Land worked on a plan to address the PIP.  Winn was to take some of Land's responsibilities, including the propane reports, so that Land could focus on the showroom.  Hash was not involved in the discussions.  In mid-February 2014, Land wrote a letter to Garcia in human resources and to Southern States Vice President, Anne Clingenpeel, outlining his disagreement with the PIP, but he did not send the letters until March 10, 2014, and he did not approach Hash about the concerns set out in the letters.  In the twenty-three single-spaced pages setting forth details of his dissatisfaction with his managers and his position and the obstacles Land believed he faced in improving under the PIP, there was no mention of his physical condition, any request for accommodation, or mention of his age.

Meanwhile, Hash visited the store again on February 13, 2014, and discussed what he viewed as poor work with respect to the store layout, shelving, and stocking plans with Land.  Land disagreed with the characterization and blamed the problem on a lack of inventory.  It was only on February 15, 2014, that Land

emailed Winn, with a copy to Hash, about the plans that Winn and Land had made on February 10, 2014. The email never mentions Land's physical condition or any request for accommodation even though Land maintains that he was experiencing pain during this time frame, even lying down to stock low shelves so that no one saw the pain that he was experiencing.[3]

On February 27, 2014, Hash visited the store again to discuss job expectations with Land and reset a "plan-o-gram," the corporate design for layout, shelving, and stocking, to show Land how to do the work that needed to be done. Land asked no questions. Ultimately, Hash felt that Land did not attempt to accomplish what was set out under the plan and spent his time, instead, trying to prove that the PIP was incorrect. Hash evaluated Land using the same standards that he used to evaluate other assistant managers, based on tasks, to evaluate Land's job performance.

As they had agreed, Winn was taking on many of Land's duties during the PIP and observed that other store employees were disgruntled and that, while Land spent 25-50 percent of his

---

[3] While Land avers that Southern States might have instituted the use of a stool on the floor or provided an employee to relieve Land for work breaks and to help with lifting, there is no record that Land ever made such a request, suggestion, or proposal to his employer. There is no evidence before the Court upon the parties' pleadings that he discussed such accommodations with his physicians.

time working on propane, it only took Winn 5-10 percent of his time to complete the task.  Winn ultimately felt that Land was not dedicated to the operations and success of Southern States during the PIP.

Termination of Land's employment was finally discussed during the last seven to ten days of the PIP.  On March 10, 2014, when Hash and Sweat were already discussing Land's discharge from employment, Land sent his letters to Garcia and Clingenpeel, making a reference to "discrimination" but not identifying a protected class or activity from which it flowed.  Only Hash and Sweat were involved in the decision to terminate Land's employment, with input from Garcia and Geralyn Gravett from human resources.  Neither Winn nor Briedwell were involved in or consulted about the termination decision.

Land's employment was terminated on March 21, 2014.  He was fifty-eight years old at the time of his discharge.  Winn, Hash, Briedwell, Sweat, and Garcia were all in their fifties at that time. A younger worker, Eric Medley, who was a cousin to Terry Sweat's wife, was hired to replace Land.  Ultimately, it took three or four people two days of full time work to finish the plan-o-grams after the termination of Land's employment.

Land filed a charge with the Equal Employment Opportunity Commission against Southern States claiming employment discrimination and retaliation based on age and disability under

the ADA and the ADEA.   The EEOC was unable to find a violation
of the statutes and dismissed his charge.   This action followed.

## II.

Summary judgment is appropriate when citation to facts in
the court record, including depositions, documents, affidavits,
admissions, and other material, demonstrate there are no genuine
issues of material fact. Fed. R. Civ. P. 56 (c); *Celotex Corp.
v. Catrett*, 477 U.S. 317, 322 (1987). The party moving for
summary judgment bears the initial responsibility of informing
the district court of the basis for its motion and identifying
those portions of the record it believes demonstrates the
absence of a genuine issue of material fact. *See Celotex Corp.*,
477 U.S. at 323. However, "[o]nce the moving party shows that
there is an absence of evidence to support the nonmoving party's
case, the nonmoving party must present *significant probative
evidence* to demonstrate that there is more than some
metaphysical doubt as to the material facts." *ACLU v. Mercer
County*, 240 F. Supp.2d 623, 624 (E.D.Ky. 2003) (*citing Moore v.
Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993) (emphasis
added) (internal punctuation removed)). The non-moving party may
not "rely on subjective beliefs to show a genuine dispute" nor
may they "defeat summary judgment by conclusory responses."
*ACLU*, 240 F. Supp. 2d at 625. Moreover, "[t]he mere existence of
a scintilla of evidence in support of the plaintiff's position

will be insufficient." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

For the purposes of this Memorandum Opinion and Order, claims of age and disability discrimination under the Kentucky Civil Rights Act "are analyzed in the same manner" as claims brought under federal law. *Sharp v. Aker Plant Servs. Grp., Inc.,* 726 F.3d 789, 797 (6th Cir. 2013) (analyzing age discrimination claim); *Bryson v. Regis. Corp.,* 498 F.3d 561, 574 (6th Cir. 2007) (analyzing disability discrimination claim). As explained below, Plaintiff's claims under both the ADA, the ADEA, and the KCRA fail as a matter of law.

## III.

As an initial matter, the Court notes that Southern States objects to the opinion testimony relied upon by Land and offered by his treating physician Dr. Crystal because it purports to define legal terms, draws legal conclusions, and makes conclusions regarding liability and is, thus, inadmissible under FRE 704(a). The Court need not reach this matter in light of the rationale for its decision below and declines to do so.

## IV.

The Court first considers Plaintiff's claim that he was discharged from his employment due to a disability. Southern States argues that Land cannot establish that Land was disabled at the time of his discharge or that, in any event that it knew

or had reason to know of his disability.  For the purposes of the Court's present analysis, it is willing to accept that Land was "disabled" and could not perform certain activities from June 6 to October 23, 2013.  Southern States has set forth evidence that Land was cleared to return to work without restriction after October 23, 2013, but Land insists that he was disabled with respect to his ability to stand through at least February 13, 2014.  There is no evidence, however, that he presented his employer with any formal request for accommodation or evidence of his purported disability or limitations in the later time period.

Under the ADA, it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discriminating "on the basis of disability" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

In order to establish a *prima facie* case of disability discrimination under the ADA, an employee must show that "1) he

or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011) (*citing Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir.2007)). "[I]f the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' 'Should the defendant carry this burden,' the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). "The plaintiff retains the burden of persuasion" at all stages. *Id.* at 256.

The Court appreciates Southern States' argument that Land cannot establish a prima facie case of disability discrimination under the ADA because, as a matter of law, he was not disabled at the time of his discharge and, to the extent that Land was disabled at that time, Southern States did not have knowledge of any disability. There is no dispute that Land had a surgery on his right knee which resulted in restrictions or that he was

released to work by his physician without restrictions on October 23, 2013. After that time, there is no evidence to support any conclusion that Land had further restrictions or treatment for his knee. For that matter, there were no restrictions to support any request for accommodation established by the physician who treated his lower back in the period leading up to February 13, 2014. Certainly, Land told Winn of his lower back problems and pain, but Winn was not a decision-maker in the termination process nor is there any evidence that those involved in that process, including Hash, Garcia, or Sweat, had information regarding Land's potential for back surgery or any requests for accommodation that Land had made with respect to his back.

That said, the Court is more impressed with Southern States' argument that Land received the accommodations that he requested during his period of disability following his knee surgery and did not actually request what he now describes as the reasonable accommodations that he should have received – such as obtaining a stool or someone to perform lifting tasks.

The ADA only requires an employer to make "reasonable accommodations to the known . . . limitations of an otherwise qualified individual with a disability" where such an accommodation does not cause the employer "undue hardship." 42 U.S.C. § 12112(b)(5). Employers are not required to handle

accommodation requests and discussions perfectly, only reasonably and in good faith. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862 (6th Cir. 2007). When failure-to-accommodate is at issue, the employee bears the initial burden of "proposing" an accommodation and showing that it is "objectively reasonable." *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004). The burden then shifts to the employer to show that the accommodation "would impose an undue hardship." *Id*. To determine whether a reasonable accommodation exists, both parties must participate in an "interactive process" and "do so in good faith." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010); 29 C.F.R. § 1630.2(*o*)(3). The interactive process, though, is triggered by an employee's request for accommodation. *Melange v. City of Ctr. Line*, 482 F. App'x 81, 86 (6th Cir. 2012)

No one disputes that Land received the leave that he actually requested for his knee surgery or that he was then permitted to return to work under his doctors' restrictions. To the extent that Land did not comply with those restrictions, sometimes working more than he was supposed to work, for example, he did so without advising his supervisors. He testified that he listed his working hours in accordance with his restrictions and did not tell anyone that he was working in excess of the restrictions imposed by his physicians due to the

condition of his knee.  Accepting that Land later indicated to Winn that he felt back and knee pain as late as October 2013, might have to have back surgery in a few months, and, thus, wanted to spend more time in the office rather than on the floor, there is evidence that he offered medical support to advise his employer that he was disabled due to his back or for the restrictions he proposed for any low back issues.  The Court agrees that, in this instance and on these facts, complaining of pain, attending doctors' visits, and working in secret do not constitute requests for accommodations, reasonable or not. Southern States did not have an obligation to provide an accommodation until Land provided a diagnosis and requested specific accommodation. *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 437 (6th Cir. 1998); *Crocker v. Runyon*, 207 F.3d 314, 319-20 (6th Cir. 2000); *Burns v. Coca-Cola Enterprises, Inc.*, 222 F.3d 247, 258 (6th Cir. 2000).

For example, the Sixth Circuit held that an employee's general request to transfer "to a vacant position in a well-ventilated and allergen-free workstation that would not 'trigger asthma or cause a drop in peak flow'" was too vague; so too is Land's complaint that the concrete floor aggravated his back and his knee. *See Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 635 (6th Cir. 1998).  At best, Land made generalized statements to Winn that he thought he should sit and take a break from time to

time. There is no allegation or assertion that anyone ever told Land he could not sit and take breaks. Land argues that Winn made facial expressions which he interpreted as discouraging him from requesting accommodations and that he believed Winn was not sincere when he asked if land could handle the store. His subjective belief does not undermine the fact that Land never requested the accommodation.

Ultimately, Southern States argues that it discharged Land from his employment for poor job performance, a legitimate non-discriminatory reason. While Land disagreed with the negative assessments of his performance and will rely upon positive comments from his direct supervisor, Winn, "the law does not require employers to make perfect decisions, and an employee's mere disagreement with an employer's subjective evaluation of his performance is not relevant in an age-discrimination claim." *Browning v. Dep't of Army*, 436 F.3d 692, 698 (6th Cir. 2006). Moreover, if anything, this case presents a mere conflict in personality and managerial style, which is a "valid reason for discharge by an employer." *Harker v. Fed. Land Bank of Louisville*, 679 S.W.2d 226, 230-31 (Ky. 1984) (*citing Kerwood v. Mortgage Bankers Ass'n of America, Inc.*, 494 F.Supp. 1298 (D.C.1980); *Ackerman v. Diamond Shamrock*, 670 F.2d 66 (6th Cir. 1982)). An employee's continued refusal to "conform to his

supervisor's managerial technique" is a legitimate, nondiscriminatory reason for termination. *Id*.

Land felt Winn, Hash, and Briedwell were bad managers, and the record establishes that he disagreed with any negative assessments of his performance, instead blaming other workers or decisions made at the corporate level. Land acknowledges that Briedwell told him repeatedly through 2012 and 2013 that he needed to improve store standards in the interior and exterior of the store and to spend more time out of his office, but Land disagreed with the directives he was given or blamed other workers or Winn for the issues. Even in Land's appraisals, which were largely positive, his direct supervisor, Winn, noted that Land needed to spend more time on the floor. When Hash began working with Land, Land disagreed with the way Hash prioritized different aspects of the store, but he acknowledges that Hash communicated priorities to him.

Once Land's PIP was instituted, Land wrote lengthy missives challenging each and every expectation and directive explained to him, and essentially attempted to re-write his plan without involving the supervisor who had actually instituted the PIP, Hash. Land nevera actually asked Hash any questions or attempted to explain any issues with the PIP to Hash during subsequent store visits. Even though Winn took on some of Land's work, the store standards did not improve, and Land did not demonstrate an

effort to improve in his job performance. Without something more, this Court cannot say that Southern States made anything but a reasonable and legitimate business decision to discharge Land due to Land's failure to improve his performance, continued disagreement with the managerial techniques of his supervisors, and deficient managerial skills.

Ultimately, Land does not present evidence from which a reasonable juror could conclude that poor performance was not the real reason that Southern States discharged Land and that unlawful discrimination or retaliation was the real reason. "To demonstrate pretext, a plaintiff must show *both* that the employer's proffered reason was not the real reason for its action, *and* that the employer's real reason was unlawful." *Ford Motor Co.*, 782 F.3d at 767 (*citing Hicks,* 509 U.S. at 515; *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 148 (2000)). The temporal proximity between the date of Land's knee surgery and the first documentation of poor work performance by Hash and the institution of meetings meant to improve his work performance cannot be ignored. However, "temporal proximity cannot be the sole basis for finding pretext." *Ford Motor Co.*, 782 F.3d at 767 (*quoting Donald v. Sybra, Inc.,* 667 F.3d 757, 763 (6th Cir. 2012)). Moreover, courts "look at the facts as they appear to the person making the decision to terminate [the employee]," not at "the employee's subjective [beliefs]." *Id.* at

768 (*citing Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1231 (10th Cir.2000). An employee's "unexpressed subjective skepticism regarding the truth of" a supervisor's motivation does not create "a triable issue as to pretext." *Id.* (*quoting Hedrick v. W. Reserve Care Sys.,* 355 F.3d 444, 462 (6th Cir.2004)). Meetings to discuss an employee's job expectations and performance do "not constitute harassment simply because they cause the employee distress." *Id.* (*quoting Keever v. City of Middletown,* 145 F.3d 809, 813 (6th Cir.1998)).

To the extent that he felt that Briedwell and Winn disapproved of his taking leave, actions by nondecisionmakers cannot alone prove pretext. Neither can decisionmakers' statements or actions outside of the decisionmaking process." *Ford Motor Co.,* 782 F.3d at 768 (*citing Bush v. Dictaphone Corp.,* 161 F.3d 363, 369 (6th Cir.1998); *Rowan v. Lockheed Martin Energy Sys., Inc.,* 360 F.3d 544, 550 (6th Cir. 2004)). Neither Briedwell nor Winn were involved in the termination decision.

Further, to the extent that Land claims that his employment was terminated in retaliation for engaging in protected activity, he has failed to provide evidence of a protected activity. To establish a *prima facie* case of retaliation in general, Land must show that "(1) [he] ... engaged in protected activity, (2) the employer knew of the exercise of the protected

right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Banks v. Bosch Rexroth Corp.*, 15 F. Supp.3d 681, 693 (E.D. Ky. 2014) (*citing Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir.2009)).  If anything, he wrote a letter on March 10, 2014, asserting that he was the subject of unspecified "discrimination," but the record evidence demonstrates that the decisionmakers were already planning to terminate his employment.

To the extent that he his asserting retaliation for seeking and taking leave or accommodation for his post-surgical knee issues, his claim must fail as well.  In order to satisfy the causal element for disability retaliation, the interval between a protected activity and an adverse employment action must be less than two months. *Asmo v. Keane, Inc.,* 471 F.3d 588, 594 (6th Cir. 2006) (construing Pregnancy Discrimination Act). Land's last known accommodation ended on October 23, 2013, when he was released to work without restrictions. Nearly *five months* passed between Land's release to work and his discharge. Similarly, the Sixth Circuit has held that only a close proximity in time, *less than three months*, will allow an inference of retaliation under the FMLA. *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012). This case

exceeds that time frame, as Land's PIP was implemented over *five months* after his July 2, 2013, return to work following his knee surgery and his termination occurred after an over six-and-a-half month gap.

Accordingly, the record does not support a contention that the proffered reason for Land's termination was pretext for disability discrimination, retaliation arising out of a claim of disability or a request for leave, or, as explained below, any other kind of unlawful motive.

**v.**

To the extent that Land avers that his discharge was due to his age rather than poor job performance, his claim fails as a matter of law.   To establish a *prima facie* case, Land must show that he (1) was a member of a protected class of persons (i.e., persons 40 years of age or over), (2) was discharged, (3) was qualified for the position held, and (4) was replaced by someone outside of the protected class. *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008) (*citing Minadeo v. ICI Paints,* 398 F.3d 751, 764 (6th Cir.2005)); *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 350 (6th Cir.1998) (*citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)). "Once a plaintiff satisfies his or her prima facie burden, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. If

the employer meets this burden, the burden of production shifts back to the plaintiff to show that the employer's nondiscriminatory explanation is a mere pretext for intentional age discrimination." *Allen*, 545 F.3d at 394 (internal citations omitted).

Assuming that he can make a prima facie case, the evidence establishes that Land was terminated for unsatisfactory job performance.  Land cannot establish pretext based on (1) Land's allegation that Briedwell told Land to "step up and do more or else we will hire someone younger and pay them a lot less" and (2) Land's subjective impression that Hash's *War Horse* analogy was about age and about Land.  In the context of age discrimination, "[i]solated and ambiguous comments are too abstract, in addition to being irrelevant and prejudicial, to support a finding of ... discrimination." *Berry v. Frank's Auto Body Carstar, Inc.*, 495 F. App'x 623, 626-27 (6th Cir. 2012) (*quoting Ercegovich*, 154 F.3d at 355).  No reasonable juror could conclude that Southern States' reason for Land's termination was a pretext based on the record.

Further, Briedwell's comment cannot carry Land's burden because Briedwell was not involved in the decision to terminate Land. As a matter of law, "statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden ..."

of demonstrating animus. *Ford Motor Co.*, 782 F.3d at 768 (*citing Bush*, 161 F.3d at 369; *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989)). Further, it was made in 2012, well over a year before Land's termination in 2014. *See Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1026 (6th Cir. 1993) (holding that statements made nearly a year before an alleged adverse employment action are considered to have been made too far away in time to have influenced a termination decision). Accordingly, it cannot be used to prove pretext.

Similarly, Hash's *War Horse* analogy cannot establish pretext. A reasonable juror cannot read discriminatory animus into the *War Horse* analogy based solely on Mr. Land's subjective belief that the analogy was directed at him. *Phelps*, 986 F.2d at 1025. For example, in *Phelps*, the Sixth Circuit held that a statement made directly to the plaintiff that she was too old to be a secretary and that her fifty-fifth birthday was a cause for concern was too isolated and ambiguous to show pretext. *Id.* Here, the analogy was made to a room of people, and Hash did not expressly identify Land in making the remark. Land's subjective impression that the analogy was directed to him is not sufficient to allow a reasonable juror to establish pretext.[4]

---

[4] The Court sees no reason to engage with Plaintiff's argument that he was actually terminated to make room for a cousin of the wife of his regional manager. Even assuming that happened, nepotism is not illegal discrimination and,

Plaintiff's claim for discrimination under the ADEA fails as a matter of law.

**VI.**

Nor has Land demonstrated that he was subjected to a hostile work environment under the ADA. In order to support a finding of a hostile work environment, the evidence must show a work setting "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Plautz v. Potter*, 156 F. App'x 812, 818-19 (6th Cir. 2005) (*quoting Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)). To evaluate this issue, courts

---

accordingly, cannot serve as evidence of discrimination or of pretext. Although nepotism may not be "fair," as Southern States explains, it is not illegal discrimination that is actionable under the ADA, the ADA, or Title VII. *E.g., White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005); *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1096 (6th Cir. 1996); *Trentham v. K-Mart Corp.*, 806 F. Supp. 692, 703 (E.D. Tenn. 1991) *aff'd*, 952 F.2d 403 (6th Cir. 1992). In order "[t]o demonstrate pretext, a plaintiff must show *both* that the employer's proffered reason was not the real reason for its action, *and* that the employer's real reason was unlawful." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (citing *Hicks,* 509 U.S. at 515; *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 148 (2000)). As a matter of clear, well-established law, employment decisions based on familial favoritism, while perhaps unfair, are *not* unlawful discrimination. As nepotism is not unlawful discrimination, it cannot carry Land's burden of demonstrating illegal discrimination, a hostile work environment, or that the reason for his termination - a poor relationship with management and inadequate job performance – was a pretext for illegal discrimination.

consider the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (*citing Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 116 (2002)). Here, nothing in the record reflects any physical threats or that Land was humiliated, mocked or teased for having a disability. While Briedwell and Hash certainly had conversations with Land about his poor job performance, "[c]onversations between an employee and his superiors about his performance do[] not constitute harassment simply because they cause the employee distress." *Keever v. City of Middletown,* 145 F.3d 809, 813 (6th Cir. 1998). There is simply no evidence of severe or pervasive conduct which might be conceivably create a hostile work environment. As a matter of law, no reasonable juror could conclude that Land was subject to a hostile work environment on the record evidence, and this claim must fail.

## VII.

Finally, Land's breach of contract claim against Southern States fails. "[I]n the absence of a specific contractual provision to the contrary, employment in Kentucky is terminable at-will, meaning that an employer may ordinarily discharge an employee "for good cause, for no cause, or for a cause that some might view as morally indefensible." *Miracle v. Bell Cnty.*

*Emergency Med. Servs.*, 237 S.W.3d 555 (Ky. Ct. App. 2007).  Land has identified no agreement by and between the parties, and he does not argue, for example, that the employee handbook or his information and non-solicitation agreement constituted an employment agreement.  Without more, his claim fails as a matter of law.

### VIII.

For all of the reasons stated above, Plaintiff's claims cannot survive as a matter of law, and Defendant's Motion for Summary Judgment is well-received.

Accordingly, **IT IS ORDERED**:

(1) that Defendants' Motion for Summary Judgment [DE 64] is **GRANTED.  Judgment will issue by separate order.**

**IT IS FURTHER ORDERED**:

(2) that the final pretrial conference scheduled for Monday, September 12, 2016, is **CONTINUED GENERALLY**, pending further order of the Court.

This the 9th day of September, 2016.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge